[Cite as *Partin v. C.S. White Industries, Inc.*, 2016-Ohio-4894.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY**

| | | |
|---|---|---|
| DENNIS PARTIN | : | |
| | : | |
| Plaintiff-Appellant | : | C.A. CASE NO. 2015-CA-23 |
| | : | |
| v. | : | T.C. NO. 14-276 |
| | : | |
| C.S. WHITE INDUSTRIES, INC. | : | (Civil appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___8th___ day of _____July_____, 2016.

. . . . . . . . . .

WILLIAM P. ALLEN, Atty, Reg. No. 0064046, 3420 Atrium Blvd., Suite 160, Middletown, Ohio 45005
    Attorney for Plaintiff-Appellant

JAMES D. UTRECHT, Atty. Reg. No. 0015000, 12 S. Plum Street, Troy, Ohio 45373
    Attorney for Defendant-Appellee

. . . . . . . . . . . .

DONOVAN, P.J.

{¶ 1} This matter is before the Court on the Notice of Appeal of Dennis Partin, filed November 12, 2015. Partin appeals from the October 21, 2015 "Decision/Judgment Entry Granting Defendant's Motions for Summary Judgment," in favor of C.S. White Industries, Inc. DBA St. Mary's Tool and Die ("St. Mary's"), on Partin's statutory and common law workplace intentional tort claims. We hereby affirm the judgment of the trial

court.

{¶ 2} On May 27, 2014, Partin filed a "Complaint for Workplace Intentional Tort" against St. Mary's.   Therein, Partin alleged that he was employed as a machinist by St. Mary's in Troy, which "is a company that machines, fabricates, manufactures and creates various dies and other products and performs other industrial work."   According to Partin, he was injured on May 10, 2010 in the course of his employment.   Specifically, Partin alleged that his supervisor, Craig White, instructed him to assist coworker Scott Grau in the operation of a Verson 400 ton press.   Partin alleged as follows:

> At the time of the incident the Verson press was being used to punch metal knives out of sheets of metal.   Partin was located directly opposite of Grau on the out-feed side of the Press.   Grau's job duties included feeding the metal sheet into the press and advancing the metal sheet for the punching operation.   The ram which held the punching die descended from above the metal sheet.   The ram was activated by the operator, Grau, who must simultaneously actuate dual palm controls with each hand in order to cycle the machine.   These dual palm controls are designed to ensure the operator's hands are clear from the point of operation before the ram descends, punching the metal.   After the machine punches the parts, the parts fall out.   Partin was then required to clean the scraps from the press by hand and manually manipulate the locating pins and adjust the machine stops, both of which to position the metal sheet for the next cycle.   At the time of injury, there was no guarding on the side of the press where Partin was required to work.   Mr. Grau hit the dual palm activation buttons while

Plaintiff Partin was cleaning out the scraps, manipulating the locating pins, and/or setting the stops. The machine ram then cycled downward while Partin's right, dominant hand was in the point of operation severing his right thumb.

{¶ 3} Partin further asserted that prior to May 10, 2010, the Verson press "was previously equipped with two sets of dual palm safety controls which required both sets of buttons to be depressed before the machine would cycle." Partin alleged that the "second set of dual palm safety buttons was intentionally removed by St. Mary's or its agents and/or was beyond the reach of Partin's assigned location at and prior to Partin's injury." Partin asserted that "the means, manner and mode of the operation established by St. Mary's effectively removed, eliminated and/or bypassed safety guards designed to protect workers similarly situated as Partin operating or assisting on the press from known dangers posed by the cycling ram."

{¶ 4} Partin asserted that the Verson press "was equipped and guarded with additional safety devices," including "laser light curtains" and "expanded metal mesh screens which prevented intentional or inadvertent entry of body parts into the point of operation," and that St. Mary's removed these guards. Partin alleged that the Verson press "is believed to have originally had a selector switch which enabled the machine to operate in various modes, including; use of only one set of dual palm controls, and use of both dual palm controls. At the time of Partin's injury, only one dual palm control was operational." According to Partin, by "operating the Verson press with the second dual palm control disabled, bypassed, or otherwise rendered unavailable for use, and/or allowing the press to be operated in this fashion with full knowledge of the employer, St.

Mary's removed a critical safety guard." Partin alleged that St. Mary's committed an employment intentional tort pursuant to R.C. 2745.01, as well as "a common law intentional tort pursuant to *Fyffe v. Jeno's* and its progeny." Partin asserted that despite "actual knowledge of the exact danger and hazard, and actual knowledge of the substantial certainty of injury to Partin, St. Mary's required, or acted to require, Partin to clean scraps, manually manipulate positioning pins and adjust the machine/material stops, while the press was * * * energized and operable, and with safety guarding removed."

{¶ 5} Partin asserted as follows:

As a direct and proximate result of the Intentional Acts and omissions of Defendant St. Mary's, Plaintiff Partin, was severely injured. His injuries include, but are not limited to, permanent amputation of his right thumb. He has experienced and will continue to experience pain, discomfort, and embarrassment from time to time and has endured a loss of ability to perform usual and specific activities of life, which conditions are permanent in nature.

{¶ 6} St. Mary's filed an answer on June 20, 2014, and on February 17, 2015, St. Mary's filed a motion for partial summary judgment. In its Motion, St. Mary's indicated that the instant matter "is the refiling of Case #12CV279, which was voluntarily dismissed under Civil Rule 41(A) on December 5, 2013," and that "certain depositions taken in case 12CV279 are part of the record in this case." St. Mary's asserted that with "respect to the claims in paragraphs 7 and 8 of the Complaint, the evidence is uncontroverted and there is no factual basis for these claims. Those claims are: (1) Removal of 'laser light

curtain' guards and (2) Removal of 'expanded metal mesh screen gate guards.' " According to St. Mary's, there "never were laser light curtains on the machine. Metal mesh gates were never a part of the machine and never were 'equipment safety guards' as that term is used in the statute and cases. Issues as to what constitutes equipment safety guards are issues of law for the Court to decide."

{¶ 7} St. Mary's asserted that the "Verson press came with two sets of dual palm buttons, tethered by electric cables to the front of the Verson press. Shortly after delivery of the Verson Press, an employee was instructed to put expanded metal mesh screen gates on three sides of the machine." According to St. Mary's, the purpose of the gates "was to keep pedestrians and employees from walking behind the Verson press while it was operating. * * * Thus, the gates were not designed to protect the operator, from the press; they were to block an aisle way to keep other people out."

{¶ 8} According to St. Mary's, C.S. White Industries purchased St. Mary's in 2002, and at that time, "it ordered the removal of the barrier guards from the Verson press, to make it usable for other types of work. * * * At that point, the Verson press was returned to its original condition in terms of safety features." St. Mary's argued that Partin was hired in 2007 and trained by Scott Grau on the operation of the Verson press. St. Mary's argued as follows:

On May 10, 2010, St. Mary's Tool and Die was using the Verson press to make round Hobart slicer blades. * * * As this was a two-person job, Plaintiff was assigned as the helper to Scott Grau. The press punches out eight round Hobart slicer knife blades from a rectangular piece of steel, one at a time. Mr. Grau was responsible for feeding the stainless steel in

from the front of the press, and operating the controls of the press. The press would cycle when Mr. Grau pressed the dual palm button controls. * * * Plaintiff assisted Mr. Grau by removing the scrap metal from the back of the press. * * * This job did not require Plaintiff to place his hands into the press; merely just catch the scrap metal pieces and throw them into the scrap hopper.

That afternoon, while helping with the Verson press, Plaintiff inserted his right hand into the press area right before Mr. Grau pressed the dual palm button controls, causing the machine to cycle down. * * *

Regarding the dual palm controls, Plaintiff states that he did not see Mr. Grau place his hands on them. * * * Plaintiff went on to state that when he is working at the back of the machine, he can see where the operator's hands are, including when they are on the dual palm controls. * * * Plaintiff further stated that it was not generally his practice to look to see where the operator's hands were while they were working. * * *

{¶ 9} According to St. Mary's, "in order for Plaintiff to succeed on his employer intentional tort claim, he must provide evidence that the laser light curtains and/or the expanded metal mesh screen gates were equipment safety guards as defined in R.C. §2745.01; that they were required by the manufacturer, and they were removed. No such evidence exists." St. Mary's asserted that its "conduct in never having laser light curtains or in removing after-market expanded metal mesh screen gates does not violate O.R.C. §2745.01. Defendant is entitled to judgment as a matter of law on these two claims."

{¶ 10} Attached to the motion is the affidavit of Craig. S. White, the owner of St. Mary's. White averred as follows:

* * *

2. One of the assets of the aforementioned business is a Verson press, a photo of which is made a part hereof in Figure 1.

3. Another asset is a smaller Minster Press shown in Figure 2. To the rear of such press are expanded metal mesh gates, which were fabricated and installed prior to my ownership of the business and are still in place on that machine today.

4. Located in the storage lot outside the plant are smaller expanded metal mesh gates that various deponents in this case have testified were, at one time, installed inside the plant to the sides and rear of the Verson Press, to block pedestrian traffic. These gates are depicted in Figure 3.

{¶ 11} On March 3, 2015, Partin responded to the motion for partial summary judgment. Partin acknowledged that there "is no evidence that light curtains ever existed on the press in question. Therefore, Plaintiff does not oppose the portion of defendant's motion regarding same." Partin asserted, however, that "the metal screen guards which were installed, and subsequently intentionally removed, by the employer, constitute 'safety guards.' The removal of same raises a rebuttable presumption of 'actual intent to injure' pursuant to ORC 2745.01." According to Partin, " a genuine issue of material fact remains regarding the presumed intent found in O.R.C. 2745.01(C)."

{¶ 12} Partin asserted that his job at the time of his injury "did indeed require him to, and others similarly situated, to reach into the point of operation multiple times per

sheet of material processed." According to Partin, "the Verson press was actually equipped with two separate sets of dual palm button controls. * * * At the time of the injury, only the 'right set' was functioning. The left set was intentionally disabled. The left set would not reach to the rear of the machine where Partin was working." Partin asserted that the "press had a key switch which allowed the employer to choose whether the left, right, or both sets had to be simultaneously pressed before the press would cycle. If the key switch is positioned at right only, the left palm control is disabled."

{¶ 13} Partin argued as follows:

Based on the current state of the law regarding intentional torts, this court is faced with a fairly straight forward, two question inquiry. First, was the metal gate barrier guard an "equipment safety guard"? That is, was it designed to shield the operator from exposure to, or injury by, a dangerous aspect of the equipment? * * *The expert says it was an equipment safety guard. The employee who designed, created and installed the gates testified it protected ALL employees, including an operator. He is also the one who told Mr. White that removing the guards violated OSHA safety standards. * * * Accordingly, the first inquiry must be answered affirmatively.

The second inquiry is whether the employer "deliberately removed" the guards. Deliberate removal occurs "when an employer makes a deliberate decision to lift, push aside, take off, or otherwise eliminate that guard" * * *. Removal may encompass more than physically removing a guard from equipment and making it unavailable, such as bypassing or disabling the guard * * *. Again, the court need only look at the defendant's

brief.

"After [St. Mary's] purchased the assets, ***it ordered the removal of the barrier guards from the Verson press . . .***" Defendants' brief, P.7.

Hence, the court must answer the second question in the affirmative.

{¶ 14} On March 6, 2015, St. Mary's filed another motion for summary judgment "on the issues of the key selector switch and dual palm buttons, which Plaintiff alleges were removed by the employer. Defendant states that the uncontroverted evidence, even that from Plaintiff's own experts, is that these devices were installed on the machine and fully operational at the time of Plaintiff's accident." According to St. Mary's, the "Legislature has determined that workplace intentional tort cases must be limited to very specific deliberate intent cases. The Supreme Court of Ohio has given legal definition to what 'removal' means. The evidence is uncontroverted that there was no removal, no deliberate intent, and judgment as a matter of law is appropriate."

{¶ 15} On March 20, 2015, Partin filed "Plaintiff's Cross Motion for Summary Judgment and Memorandum in Opposition to Defendant's Motion for Summary Judgment (Dual Palm Buttons)." Partin asserted in part as follows:

The only qualified expert testimony currently before the court is the depositions (sic) of Partin's machine safety experts, Dr. Tom Huston and Gerald Rennell. Their testimony establishes that both the barrier guards and the dual palm buttons are "equipment safety guards" as that term is defined by the Ohio Supreme Court. White agrees. The evidence, indeed the defendant's admission in the original Motion for Summary Judgment, establishes the barrier guards were deliberately ordered removed by the

employer, White. Both experts testified that the act of turning the key switch to "right only" deliberately removed a second "equipment safety guard", the left set of dual control buttons. There is no dispute that the buttons remained attached to the machine. There is no dispute that if White had ordered the key switch turned to "both," the left set would have functioned, and all four buttons (two on each stand) would have to be depressed simultaneously in order to get the press to cycle.

No one has testified that either the barrier guards or the dual palm buttons are not "equipment safety guards", other than defense counsel.

No one, except defense counsel, had testified that turning the left set of dual palm buttons to "off", de-energizing them, rendering them non-operational, and non-functional, was anything but deliberate removal of an equipment safety guard.

Reasonable minds could only conclude that White, as the employer, intentionally removed two separate safety guards from the Verson Press. * * *

{¶ 16} On March 31, 2015, St. Mary's opposed Partin's motion for summary judgment. St. Mary's directed the court's attention to the "testimony of Plaintiff's experts to the effect that the removal [of the 'barrier guard/gate'] was necessary and proper because otherwise the machine would not have been capable of producing slicer blades. They would have prevented the Plaintiff from performing his job at all." St. Mary's asserted that both "of Plaintiff's experts admit the dual palm buttons were installed and operable. To say they were removed flies in the face of these admissions."

{¶ 17} On May 28, 2015, the Ohio Bureau of Workers' Compensation ("BWC") filed a "Motion to Intervene," asserting that "it has an interest relating to the subject matter of this action as a subrogee." The court granted the motion, and on July 1, 2015, BWC filed a crossclaim against St. Mary's.

{¶ 18} On September 29, 2015, St. Mary's filed a "Statement of Additional Authority as to Defendant's Motion for Summary Judgment," directing the court's attention to *Hoyle v. DTJ Enterprises, Inc.*, 143 Ohio St.3d 197, 2015-Ohio-843, 36 N.E.3d 122. St. Mary's asserted "there is no evidence that what occurred here was done with intent to injure or with deliberate intent to injure."

{¶ 19} In ruling in favor of St. Mary's, the court concluded that "the metal mesh gates were not 'equipment safety guards' under Section 2745.01(C) because they were not part of the original design of the press and in fact, the gates prevented the press from being operated as intended by its manufacturer. The gates are more of a free standing fence which created a physical barrier between pedestrians/employees and the press." The court determined that St. Mary's "is entitled to judgment on this issue as a matter of law because reasonable minds can come to only one conclusion which is adverse to Plaintiff's claims regarding the gates."

{¶ 20} The court further determined that "the key switch and the dual palm controls are 'equipment safety guards' because they work in conjunction with one another as a safety device which activates the cycling of the press. Therefore, there are no genuine issues of material fact regarding the characterization of these devices as safety guards under R.C. 2745.01(C)."

{¶ 21} The court next analyzed whether St. Mary's "deliberately removed these

safety guards." The court noted that there "is no evidence in the record that suggests that Defendant ordered or otherwise required its employees to use the key switch in a specific manner. Employees were trained in the operation of the key switch; however, they were not required to use a specific safety setting." The court noted that while Partin argued "a supervisor must keep the mode in 'both' and remove the key to ensure the safe operation of the press," Partin and his experts "failed to provide evidence that Defendant instructed the Plaintiff or any employee to <u>only</u> operate one set of dual palm controls. The evidence established that the key was still in the control panel for any operator to switch the modes of the dual palm controls." The court noted that there was evidence "that both sets of dual palm controls had been used in the past at the facility," and there "was no evidence of defendant disabling, eliminating or shutting off the key switch or making a careful decision to eliminate the two sets of dual palm controls." It was significant to the court that all "of the components were available if any operator wanted to access or utilize them." The court concluded that "there is no genuine issue as to any material fact in that Defendant did not deliberately remove an equipment safety guard."

{¶ 22} Finally, the court considered Partin's common law intentional tort claim. The court noted that to "establish the substantial certainty *Fyffe* prong, the plaintiff must demonstrate that the defendant had known that the plaintiff's job duties exposed plaintiff to that exact danger in a way that harm was substantially certain to befall plaintiff." The court determined that Partin "has failed to provide any evidence that Defendant knew Plaintiff's injury was substantially certain to occur. There was no evidence of prior accidents on the subject matter Verson press. The absence of prior accidents strongly suggests a lack of substantial certainty." The court noted the lack of evidence that St.

Mary's deliberately removed a safety guard and concluded that Partin "has been unable to prove that there was a substantial certainty of harm and that Defendant ignored the risk and required Plaintiff to continue to perform the job." It was significant to the court that "in this case the operators of the subject matter press including Plaintiff had the ability to activate either or both sets of dual palm controls. There is no evidence that Defendant directly or impliedly restricted the Plaintiff's use of the dual palm control safety devices or key switch." The court concluded, "when construing the evidence in favor of the Plaintiff, the Court finds that there are no issues as to any material fact regarding Plaintiff's common law intentional tort claims because the Plaintiff has failed to offer any evidence that would satisfy the second and third prongs of the *Fyffe* test.*"*

{¶ 23} Partin asserts the following assignment of error:

THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO THE EMPLOYER IN AN INTENTIONAL TORT CASE, WHERE THE EMPLOYER "DELIBERATELY REMOVED" TWO "EQUIPMENT SAFETY GUARDS," TRIGGERING A REBUTTABLE PRESUMPTION OF ACTUAL INTENT PURSUANT TO R.C. 2745.01(C). FURTHER, THE TRIAL COURT ERRED IN FAILING TO FIND REASONABLE MINDS COULD CONCLUDE THAT AN EMPLOYER, WITH A DEGREE IN MECHANICAL ENGINEERING, WHO KNEW THE EXISTENCE AND PURPOSE OF DUAL PALM CONTROLS, WHO FORMERLY WORKED AS GENERAL MANAGER, NORTH AMERICAN OPERATIONS WITH THE MANUFACTURER OF THE WORLD'S LARGEST PRESSES, AND WHO ORDERED AN EMPLOYEE TO WORK

ON A PRESS, BY PLACING HIS HANDS INTO THE POINT OF OPERATION WHILE THE POINT OF OPERATION GUARDS WERE DISABLED, AFTER HAVING BEEN WARNED OF THE EXACT DANGER, RESULTING IN AMPUTATION, DID COMMIT A COMMON LAW EMPLOYMENT INTENTIONAL TORT.

{¶ 24} Regarding the dual palm buttons, Partin argues as follows:

The trial court below found that the second set of dual palm buttons was not deliberately removed, because any operator was free to turn the key and reenergize the second set of buttons. This ignores the fact that Craig White, who was in charge of all aspects of production, knew the machine was being run with the second set of buttons deliberately turned off. He knew the helper in Partin's position had absolutely no point of operation guarding. He knew the precise function of dual palm buttons and point of operation guarding in general. He was the one who assigned Partin to the job that day. As the only person in charge of production, he had never seen the second set used.

There is absolutely no dispute that the second set of dual palm buttons was disabled at the time Partin was injured. The Supreme Court has likened deliberate removal to bypassing a proximity switch with a jumper wire. How then, can a trial court conclude the dual palm buttons in this case were not "deliberately removed"? They were off, non-functional, electrically bypassed, and the sole person in charge of production knew of these facts.

{¶ 25} Regarding the metal barrier gate guards, Partin argues as follows:

* * *

Nothing in the many years of caselaw regarding intentional tort cases and nothing in the current statute requires, or even suggests, that analysis of an intentional tort only applies to original manufacturer safety equipment. The prior owner of St. Mary's recognized a hazard – the risk that employees behind the press could make contact with the point of operation of the closing press. He ordered gate guards fashioned by the company maintenance employee to completely block access to the rear of the machine. The gates spanned from the wall of the plant to the machine, and were actually attached to the press itself by locks.

After White took over, additional production work was added. White made the decision to place a worker at the rear of the machine to accomplish this work. White's company designed the die to perform the job. As designed, the die required an employee to reach into the point of operation of the press multiple times. White was solely in charge of production. Rather than address the hazards guarded by his predecessor, White simply ordered the guards removed. He did so even in spite of warnings by his own maintenance employee of the exact risk that befell Partin.

{¶ 26} Finally, regarding Partin's common law intentional tort claim, he asserts that "White knew the dangers associated with presses. He knew point of operation guards were available. He was an engineer, having been a manager of the manufacturer of the

largest presses in the world." Partin argues that White "was told, point blank, by his own repairman, that removal of the press guards was a violation of OSHA regulations, and that each operator was required to use point of operation guarding. His response was that it was his 'F'ing Company,' and he would run it as he saw fit."

{¶ 27} St. Mary's responds as follows:

> The Trial court did not err in sustaining Defendants/Appellees Motions for Summary Judgment as no genuine issue of material fact existed. There is no evidence that defendant acted with deliberate intent to injure Plaintiff. There is no evidence that point of operation guards were disabled. There is no evidence the employer had been warned of the exact danger to which an employee was exposed. There is no evidence that the employer ordered the employee to work in the press in the manner alleged. Reasonable minds could only conclude there was no intentional tort.

{¶ 28} St. Mary's argues that this "case arises from an accident. There was no intent to injure." According to St. Mary's, "summary judgment is appropriate if the claim is based upon the removal of a device that does not fit the definition of an equipment safety guard." St. Mary's further asserts as follows:

> * * * In order to arrive at the conclusion plaintiff seeks would require that the court accept an expert witness's attempt to infer intent on the part of the employer from the employer's silence. Further, this court would have to find that turning a switch the wrong way constitutes removal of the switch. Finally, they would have this court find that if the employer should know of a danger, the failure to recognize it is the same as intending to injure.

Those propositions, if accepted, would nullify [R.C. 2745.01].

{¶ 29} St. Mary's asserts that constructive notice of a danger does not impute deliberate intent. According to St. Mary's, Partin's assertions that "the employer wanted the employees to incorrectly set the key switch," and that "the employer's failure to properly instruct the employees in the use of the switch was the same as ordering them to not correctly set the switch" are "unsupported allegations." St. Mary's argues that if "such inferences of intent would be the basis of an intentional tort case, then every such case would survive a summary judgment motion."

{¶ 30} In reply, Partin argues that although his expert Thomas Huston and Gerald Rennell "agreed use of the barrier gate guards would be impractical or inefficient to use during the Hobart blade production, both clearly testified that if the gates were removed, alternative guarding had to be provided for all workers on the press." Partin asserts that "[c]ontrary to [St. Mary's] claim, White admitted Partin was required to reach into the press. The way C.S. White Industries designed and built the die used in the operation, the overwhelming evidence shows that Partin's job required him to reach into the die multiple times to push 'stops' and use a 'locating pin' to position the material."

{¶ 31} Partin asserts that St. Mary's "sole defense revolves around an alleged decision to 'leave it up to the employees' whether to re-energize the dual palm buttons." According to Partin, "Exhibit 25 of White's deposition shows a warning on the machine." Partin asserts that "Craig White, head of production and sole authority figure for the employer, consciously failed to follow these warnings from the press manufacturer. Genuine issues of material fact remain which could support a finding that White committed an Ohio workplace intentional tort."

{¶ 32} We note that in his deposition, Craig White testified that he has owned St. Mary's for 10 years. He stated that he has a mechanical engineering degree from Western Michigan University, and that he completed a "program for management development at Harvard University." White stated that upon graduation from college, he worked for Heller Machine Tools in Illinois as an engineer, "the first one they hired in the U.S." When he started, White testified that there were seven or eight employees there, and there were "around 80" when he left. While there he testified that "we moved our facility to Detroit, Madison Heights * * *." White stated further that "we built a facility in Troy; Troy, Michigan." White stated that when he left Heller, he was the "general manager of North American Operations, executive vice president." White stated that he next was employed at Mueller Weingarten, in Cincinnati, for three years as the general manager of North American operations. White stated that he was responsible for relocating the facility to the Detroit area. According to White, Mueller "built hydraulic and mechanical presses. Die casting machines. Forging presses." White stated that Mueller "built the largest presses in the world." According to White, "Mueller Weingarten and Schuler are the two big press builders in Germany," and it "was inevitable that Schuler was going to buy Mueller Weingarten," so he left Mueller after three years. At that time, White purchased St. Mary's.

{¶ 33} White testified that the Verson press did not have a barrier gate guard "as long as I have been there." When asked if at "any time prior to Dennis's injury did anyone suggest that additional guarding should go on the * * * Verson press," White responded, "No." White stated that when he first purchased St. Mary's, Steve Vienhaus was the shop foreman, but that he left the company after six months, after which time the

production responsibilities "fell on my shoulders."

{¶ 34} White stated that Partin had operated the Verson press a "couple, three times" before his injury, and that White assigned him to work with Scott Grau. White stated that eight or ten jobs on the Verson press are two-person jobs. The following exchange occurred:

Q. Have you seen the [Verson] press run with one person?

A. Yes.

Q. Have you seen the press run with two people?

A. Yes.

Q. Have you ever seen, prior to Dennis's injury, both sets of dual palm buttons used?

A. No.

Q. Do you know, prior to Dennis's injury, if the second set of dual palm buttons had ever been used since you bought the facility?

A. No.

Q. No, you don't know or no, it had not?

A. I had never witnessed it.

{¶ 35} White stated that at the time of his injury, Partin was working at the back of the press while Grau was working at the front end, and they "were running production." White stated that Grau fed stainless steel sheets into the die that are approximately ten feet long, and that each sheet produced eight blades. The following exchange occurred:

Q. Dennis was on the back side of the press?

A. Yes.

Q.   There was no point of operation guard on the back side of the press, is that correct?

A.   Yes.

Q.   The second set of dual palm controls would not reach to the back side of the press at the time of the injury, is that correct?

A.   Correct.

Q.   Scott Grau was the one who had the sole control to actuate the ram?

A.   To actuate the ram, yes.

Q.   Were there any controls on the back side of the machine where Dennis was?

A.   Other than E stop, no controls to actuate the press.

* * *

Q.   You told me that you had not operated the Verson press?

A.   Right.

Q.   What did you call Dennis's position, was he just a helper?

A.   He was a helper, yes.

{¶ 36}  White acknowledged that after Partin's injury, a modification was made so that "the cord for the second set of palm controls has been extended so it reaches around the back side of the machine."   The following exchange occurred:

Q. * * * Now when we're talking about the controls, I saw a control on the control panel to the left of the operator that has left, right, and both, and I don't remember what order those are in, but it was a key selector?

A. Right.

Q. When we say left, I am assuming that is the left palm control button which reaches around the back of the machine?

A. The one that now reaches around the back of the machine, yes.

Q. * * * So at the time of the injury only the right palm control was selected?

A. I would have to say yes. I'm not sure but - - but that's usually how they ran it.

Q. Had you ever seen it run with that key selector in anything but right?

A. I can't, I can't say that I have one way or the other.

Q. Are there any specific operations manuals that tell the operator how to run this machine or is it just that manufacturer's manual that the company has?

A. That's the only manual we have.

* * *

Q. The key selector for left, right and both, does that always stay in the machine or is the key ever removed?

A. I'm pretty sure the key stays in there.

{¶ 37} White testified that in making the slicer disks, Partin was required to work on the back side of the machine, and that he was required to reach into the die area in the course of his work. White testified as follows:

Q. Do you know how long St. Marys has been stamping the slicer

disks for Hobart?

A. I would say eight years, maybe longer, maybe nine.

Q. So you got the job since your takeover?

A. Yes.

Q. Do you know who you took that job away from?

A. It was a new product. It was a design change and we helped develop the new design.

Q. You all made the die?

A. We made the die, yeah.

Q. I think I asked you this, but you recognize prior to this injury that the use of dual button palm controls was a point of operation guard?

A. * * * It is a form of guarding, yes.

Q. And you knew that before the injury?

A. Sure.

Q. Do you know, either before or after this incident, did you come to learn whether the Verson press ever had any other form of guarding on it?

A. Not since I have been there. * * *

{¶ 38} White testified that from the time he bought St. Mary's until Partin's injury, the Verson press had been repaired but "[t]here's been no changes to the design of the press." The following exchange occurred:

Q. The press came with the feeder on the right side?

A. Yes, exactly.

Q. When you bought it?

A. Exactly the way you see it.

Q. When the key selector switch was selected to right only, the left palm control did not function?

A. If the key switch is turned to the right only, then only the right palm switch will operate.

Q. The left palm is disabled at that point?

A. Yes, if the key switch is on right only.

Q. And you have no reason to believe that the key switch was on anything but right only at the time of Dennis's injury?

A. I have no reason to believe either way. I couldn't tell you. It was probably right only.

* * *

Q. At the time you bought St. Mary's, * * * the Verson press had two sets of dual palm controls?

A. Yes.

Q. And at the time of Dennis's injury it had the same two sets of dual palm button controls?

A. Yes.

Q. And you made no changes to those between the time you purchased it and time of the injury?

A. Right.

{¶ 39} White identified as Exhibit 25 a photograph of a decal on the Verson press

that provides in part:

> KEEP HANDS OUT OF DIES AND NEVER OPERATE THIS MACHINE
>
> UNLESS
>
> * * *
>
> You and every operator and or helper are protected from injury by a guard
>
> or safety device.
>
> EMPLOYER - - It is your responsibility to comply with OSHA and ANSI.
>
> YOU MUST control use of this machine, implement the above and also
>
> PROVIDE:   proper dies, appropriate safeguarding, training, instructions
>
> and procedures for any particular use, operation, set-up or service.

{¶ 40}  White identified as Exhibit 29 a photograph of a sign on the Verson press that provides:   "If two operators are required to run a production operation, each operator must use their own double palm control button console."   White stated that the sign was placed on the Verson press after Partin's injury.

{¶ 41}  Thomas Sellman testified that he is a retired machine repairman and that he previously worked at St. Mary's.   According to Sellman, he first worked at St. Mary's for Chuck Lucas, "[t]hen Craig White bought it."   Sellman stated that while at St. Mary's, he knew that both sets of palm buttons were operational "because I checked them all the time."   He stated that "when they run the machine from the front, it was usually just one person and there was only use for * * * one set of palm buttons."   Sellman stated that he often observed the Verson press in use by two persons, and that during those occasions, the "helper" did not have access to the dual palm buttons because "the cord was too short.   It wouldn't reach back there."   Sellman stated that he advised White "that OSHA

required * * *the palm buttons for if there's two operators you got to have two palm buttons. Three operators you got to have three palm buttons. And he told me basically that it wasn't necessary." Specifically, Sellman testified that White "told me it was his F'ing company, and he would run it any way he wanted to."

{¶ 42} Sellman stated that Chuck Lucas "had me put guards on three sides" of the Verson press, and at that time Lucas only had one operator using the machine. Sellman stated that the guards he designed, built, and installed were created to prevent employees' access to the rear of the press when it was in operation. Sellman stated that White told him to remove the guards, and that he "just told him it was against OSHA rules and he said take them off."

{¶ 43} The following exchange occurred:

Q. The most dangerous aspect of the Verson press is the closing die?

A. Yes.

Q. The gate guards, as you designed and installed them, were designed to protect an employee or operator or helper from exposure to that?

A. Yes. At that time there was no helpers. The whole basic thing was it was close to the outside doors. There was a door on this side of the press and a door on this side of the press, and people could walk in and walk behind the press.

So that's the basic reason we put those on there. The ones in the back were, like I said, they would open and close on hinges, but there was

a lock that was put on them, and I had the lock, the key to the lock. So it was, it was to keep pedestrians or other employees from getting into the back of it at that time.

Q.   It would also protect other workers?

A.   If there was any around, yes.

Q.   And anyone assigned to that press wouldn't have access to the danger area unless they came to you for the key?

A.   Right.

Q.   As it was set up before the gates were removed, the only access to the danger area was from the front of the press?

A.   Yes. * * *

{¶ 44} Regarding the production of the Hobart slicers, the following exchange occurred:

Q.   What's your understanding of how [Partin] was injured?

A.   That they were running those blades.

Q.   Slicer blades for the Hobart slicer?

A.   Right.

* * *

A.   There's three steps to getting that job started.   You got to reach in and hold a stop in.   The operator on the front would slide it forward. Then you could let go.   Then there was another one that you had to put a pin in, and then you would back up, and then the last one came to its own stop.

Q.   Okay.

A.   And every time it hit, you had to reach in and grab the scrap coming out of it.   The part itself would fall in the middle.

Q.   If those gate guards were still up, Dennis's injury would not have occurred, correct?

A.   Well, you couldn't run that machine with the gate guards up. You couldn't run that particular die with the guards on there.

Q.   Could you have run it with both sets of dual palm buttons functional?

A.   Oh, yeah, sure.

Q.   As the second set of dual palm buttons, what I'll call the left side from the front? (sic)

A.   Yes.

Q.   As they existed at the time you left, they didn't reach the back of the machine?

A.   No.

Q.   And you had raised that issue with Craig?

A.   Yes.

* * *

Q.   Had both sets of dual palm buttons been utilized, Dennis's injury would not have occurred?

A.   Most likely not.

Sellman stated that he never observed the key for the selector switch out of the machine.

{¶ 45} In order to accomplish the job for Hobart, Sellman stated on cross-examination that the gate guards he installed "needed to come off, but the palm buttons needed to be fixed at the same time." When asked how he kept himself safe while working as a helper on the Verson press, Sellman stated, "I paid attention to what I was doing." The following exchange occurred:

Q. Did you consider the gate guards to be a point of operation guard?

A. Yes, I did.

Q. And who was it designed to protect if there was no knife blade job?

A. It was basically Chuck wanted it on there because people would walk behind the press. There's a wall and the press, probably four or five foot difference in between the press bed and the wall. And, like I, said there was an outside door on this end of the press and one on this end of the press where employees would come in out to the parking lot, and that's basically why he had me to put it on there.

Q. So you considered the gate guard was to prevent people that were not working that press at all to keep them out from behind the press?

A. Right. * * *

* * *

Q. You considered the palm buttons to be the point of operation guard for the operators?

A. Yes.

Q. And the gate guards were not designed to protect the operator, it was to protect people that were walking through the area?

A. Exactly.

{¶ 46} Partin testified that he worked in total on the Verson press for "four or five eight-hour days," and that he "[e]asily" worked through over 4,000 cycles of the press, having been trained by Scott Grau. Partin stated that the press cycles in four seconds, namely two seconds from top to bottom, and then two seconds back up again. According to Partin, Grau "basically just showed me to press in the stop, use the pilot pin to locate it into the hole, and then we actuate the press." The following exchange occurred:

Q. Do you know how you got hurt?

A. Yes.

Q. Tell me.

A. Me and Scott were talking and simply distracted. As he reached to hit the palm controls I reached to press in the stop. And like I said, it takes two seconds for the press to hit, maybe three.

Q. Who was distracted, you or Scott?

A. As far as I know, we both were.

* * *

Q. During the time that you were working with Scott, did you talk to each other?

A. Yes, that's what I said. We were, we were, talking and then that's when my injury took place because we were possibly both distracted. I know I was.

Q.   Do you know what you were distracted about?

A.   Just the conversation.

Q.   Was it not work-related?

A.   No, it wasn't.   We were socializing.

* * *

Q.   Did you see Scott put his hand on the dual palm controls?

A.   Not that I recall.

Q.   When you work in the back and the machine is up, are you able to see the operator's hands to know where they are?

A.   Yeah.

Q.   * * * So you know that if his hands are not on the dual palm buttons, you know the machine will not cycle?

A.   Correct.

Q.   Was it your practice to look to see where his hands were while you were working?

A.   Not generally.

{¶ 47}  Partin stated that he observed other workers in the helper position with Grau, and that the operation was performed in the same manner.   Partin testified as follows:

Q.   * * * has anybody volunteered any information to you about what that second set of dual palm controls was for?

A.   It was for when there are two people operating the press.   If you were within so many feet of the press while it is cycling you are supposed

to have palm controls or be a certain distance away from the press to my knowledge.

{¶ 48} Gerald Rennell testified that he is a safety engineer with "McCarthy Robinson Associates, Technical Safety Associates," and that he obtained his "safety engineer's training at General Motors Institute." Rennell stated that the highest educational certificate he holds is from high school. Rennell stated that it is common for a large press such as the Verson press to have two sets of palm control buttons. According to Rennell, the "purpose of the key by the manufacturer is so that if you have one operator, and you can put the thing to 1, you take the key out and then the operator is taken care of." Rennell further testified, when "you have two operators you take the key and put it to both, you take the key out so that the operator can't change it. You want this under the, under the control of supervision. There should be a supervisor in control of the key." Rennell testified, "you are not supposed to leave the key in. The whole purpose of putting the key in there is so that you as the supervisory personnel who assigned the people to the machine, you make sure that the press is safe." According to Rennell, "one of the ways of making the press safe is to have the safeguard in the back, so you put it to 2, and then you would pull the key out. On this instance, it slowed him down a little bit because he'd have to walk over to the controls but they weren't long enough." Rennell testified as follows:

> * * * When you decide to run the press, to make sure it's safe, you got to use the two sets. If you don't want to use the two sets for some reason, if the cord is too short, put a light curtain on.
>
> If you don't want to put a light curtain on, put the barrier back up,

design the die so the part falls out, make the stops so that they're automatically setting in the pneumatics, and you don't have to reach in at all.

There's a whole bunch of ways to guard this machine, but you can't just eliminate one of the guards.

Q. And which guard was eliminated?

A. The rear set of controls.

Q. How was it eliminated?

A. It was eliminated by turning the switch to 1 and eliminated it.

Q. Okay.

A. It's gone.

Q. It doesn't work?

A. It's gone, and for all intents and purposes it might as well be over in the tool crib.   It doesn't work.

* * *

A. We know they didn't work because if they would have been working he would have had to have been using them.

Q. I understand that, but I'm talking about the way the machine was laid out and the way the job was set up, the palm buttons were left in their original location, correct?

A. I mean they are on a cord so they could be moved around.

Q. The cord was not tampered with to kill the electricity?

A. No.

\* \* \*

A.  You killed the electric when you turned the switch to 1.  You killed the electricity to those palm buttons.

Q.  The palm buttons were not taken away from the machine?

A.  Other than shutting them off, no.  They weren't removed.

Q.  And the key switch was not removed either?

A.  No, the key switch was not removed.

\* \* \*

Q.  What about that machine would alert me to the fact that the key should be set to its proper setting and then the key should be taken out of the key switch?

A.  Great big giant warning on the machine.

\* \* \*

A. \* \* \*  I was guarding presses in 1969.  I knew that. \* \* \* We know we need a safeguard for this guy.  We have no safeguard if we have the key in 1.  So we know we have to go to 2, and we have to take the key to do that.

{¶ 49}  When discussing the barrier gate guards that Sellman installed and the Hobart project, Rennell stated that "for this particular operation, all right, you would have had to redesign the die in order to use that barrier guard.  You could have done it, it wouldn't be difficult, but you would have had to because for this particular operation you couldn't use that barrier guard because the guy had to reach in to get to the stop."  According to Rennell, "this employer did build the die.  So I mean it's their fault it was

designed badly. If they wanted to use the barrier guard, all they had to do was redesign the die."

{¶ 50} Regarding White, Rennell stated that he "knew there was a second set of palm buttons on. He knew the operator in the back had no protection at all. He knew the operator at the back was reaching in, he assigned him to the machine, he told him that's the way to run it." According to Rennell, White "failed to make sure the press was guarded. Then after that, he didn't tell them to use the safeguarding system that had been bypassed. He didn't tell them not to bypass the safeguarding system." When asked if "leaving the key switch in position for the right set of palm buttons is bypassing," Rennell responded, "Yes, absolutely, sure it is, I mean the controls don't work." Rennell stated that White "set the press up with two people, one safeguard."

{¶ 51} Thomas Huston testified that he has a Ph.D in industrial engineering, a master's degree in mechanical engineering, and a bachelor's degree in engineering science, and that he is a professor at the University of Cincinnati. Huston referred to the Accident Prevention Manual from the National Safety Council, Second Edition, and the following exchange occurred:

Q. And this was a 1951 publication?

A. Indeed it is.

Q. Still in effect?

A. Yes, there have been subsequent editions to this.

Q. Why do you rely on the old one?

A. Well, I wanted to show you a principle that has been around for a long time. If you go down four pages in, which would be entitled page 6-

2, left-hand column. It is illogical and an invasion of responsibility by management to expect the most reliable worker always to be alert when working close to unguarded moving machinery.

In such cases, if the condition is allowed to continue, then accidents are virtually certain. Now the significance of that to me is I believe that's what we have in this particular case.

Q. Please explain.

A. What we have is a situation where Mr. Partin here is working in proximity to an unguarded machine, and what happens is he ended up being hurt. And the only thing that he had to rely upon there was his vigilance and the vigilance of his coworker as far as protection with regards to the point of operations, and I believe that's contrary to good sound engineering.

{¶ 52} Regarding the barrier gate guards that Sellman installed on the machine, Huston testified that the Hobart production could not have been completed with those guards in place. The following exchange occurred:

Q. With respect to the context of this case with the material being fed from the front, what was the company supposed to do?

A. What the company should do is they should use the machine as it's designed, and that's to use dual palm buttons for each individual, and if the dual palm buttons will not permit somebody to be on the back side, lengthen the cord so that they can get can get (sic) back there, if you are going to rely on them.

{¶ 53} The following exchange occurred:

Q. So you're saying that when the company, the user changed the way the machine was used, they should have thought to lengthen the cord and move the double palm button?

A. Absolutely. If you are going to rely on the dual palm button, you have to make sure that they can be used. You have effectively removed that safety device from the capability of Mr. Partin using it because of its insufficient length.

\* \* \*

Q. Your testimony is that not recognizing the need to lengthen the cord when they started feeding the material from the front to the rear was an act to intentionally injure an employee?

A. I believe, yes, in the sense if you are talking about not utilizing that other dual palm control, you have effectively removed it from being able to be used by requiring him to work on the back side.

{¶ 54} Regarding the key switch on the Verson press, the following exchange occurred:

Q. With respect to the key switch itself, are you saying that in the event the operation involved two people, and the key switch was turned to activate only the right set of palm buttons, there was an intentional removal of the safety guard?

A. Yes, what you have done there is you have removed that safety device, which is the second set of dual palm controls. It's a conscious act

that when you do that you have disabled the other one, which is the one on the left.

* * *

Q. You're saying that the employer, Mr. White, instructed the employee to turn the key to the right position at all times?

A. It's been there at all times, that's correct.

Q. Do you think he ordered that?

A. I believe that he knows about that, sir, and I believe that at least in a tacit way, yes, he has.

{¶ 55} Huston testified that Partin could have used the other set of dual palm control buttons, "but it would have been an inefficient operation; in other words, he would have had to come around to the front and be alongside Mr. Grau with every cycle of the machine." Huston testified, "I don't believe Mr. White would have agreed to the extra five or six steps that Mr. Partin would have had to take on that," because White "is trying to run an efficient shop." Huston opined that the dual palm buttons as a safety device were removed by means of the length of the short cord as well as the manner in which the key switch was set to the right, since "it precludes the use of the second set of palm buttons, so Mr. Partin would not have the ability to use those." When asked about the removal of the dual palm button, Huston testified that "it is off of his work station because it's not present in his work station."

{¶ 56} As this Court has previously noted:

Regarding summary judgment, "[a] trial court may grant a moving party summary judgment pursuant to Civ. R. 56 if there are no genuine

issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." (Citation omitted.) *Smith v. Five Rivers MetroParks*, 134 Ohio App.3d 754, 760, 732 N.E.2d 422 (2d Dist.1999). "We review decisions granting summary judgment de novo, which means that we apply the same standards as the trial court." (Citations omitted.) *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.).

*Lone Star Equities, Inc. v. Dimitrouleas*, 2015-Ohio-2294, 34 N.E.3d 936, ¶ 28 (2d Dist.).

{¶ 57} As noted by the Supreme Court of Ohio:

Because of the immunity conferred by R.C. 4123.74 and Article II, Section 35, Ohio Constitution, for the vast majority of workplace injuries, a workers' compensation claim is an employee's exclusive remedy. *See generally Van Fossen v. Babcock & Wilcox* Co., 36 Ohio St.3d 100, 110, 522 N.E.2d 489 (1988). But when an employee seeks damages resulting from an act or omission committed by the employer with the intent to injure, the claim arises outside of the employment relationship, and the workers' compensation system does not preempt the employee's cause of action. *Brady v. Safety–Kleen Corp.*, 61 Ohio St.3d 624, 576 N.E.2d 722 (1991), paragraph one of the syllabus.

*Hoyle v. DTJ Ents., Inc.*, 143 Ohio St. 3d 197, 2015-Ohio-843, 36 N.E.3d 122, ¶ 7.

{¶ 58} Regarding Partin's statutory claim, R.C. 2745.01, entitled "Requirement for

employer liability," provides in relevant part:

> (A) In an action brought against an employer by an employee, or by the dependent survivors of a deceased employee, for damages resulting from an intentional tort committed by the employer during the course of employment, the employer shall not be liable unless the plaintiff proves that the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur.
>
> (B) As used in this section, "substantially certain" means that an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death.
>
> (C) Deliberate removal by an employer of an equipment safety guard * * * creates a rebuttable presumption that the removal * * * was committed with intent to injure another if an injury * * * occurs as a direct result.

{¶ 59} "R.C. 2745.01(C) permits an employee to prove the employer's intent without direct evidence. When the employee is injured as a direct result of the employer's deliberate removal of an equipment safety guard, R.C. 2745.01(C) creates a rebuttable presumption that the employer intended to injure." *Hoyle*, ¶ 12. As noted by the Fifth District:

> There is no present legislative definition of "equipment safety guard" or "deliberate removal" for purposes of R.C. 2745.01(C). As cogently stated by the Sixth District Court of Appeals: "The General Assembly has not manifested any intent to give 'equipment safety guard' or its component terms a technical meaning. There is nothing in the statute or the case law

that suggests the General Assembly intended to incorporate any of the various equipment-specific or industry-specific definitions of guard appearing throughout the administrative or OSHA regulations, or for any agency or regulatory measure to be considered a definitional source." *Fickle v. Conversion Technologies International*, 6th Dist. Williams No. WM–10–016, 2011–Ohio–2960, ¶ 34. Furthermore, "[t]he General Assembly did not make the presumption applicable upon the deliberate removal of any safety-related device, but only of an equipment safety guard, and we may not add words to an unambiguous statute under the guise of interpretation." *Fickle*, *supra*, at ¶ 42 (emphasis added), citing *Davis v. Davis*, 115 Ohio St.3d 180, 873 N.E.2d 1305, 2007–Ohio–5049, ¶ 15, 20; *State v. Lowe*, 112 Ohio St.3d 507, 861 N.E.2d 512, 2007–Ohio–606, ¶ 15; *State ex rel. Purdy v. Clermont Cty. Bd. of Elections* (1997), 77 Ohio St.3d 338, 340, 673 N.E.2d 1351.

The *Fickle* court ultimately arrived at the following definition: "[A]s used in R.C. 2745.01(C), an 'equipment safety guard' would be commonly understood to mean a device that is designed to shield the operator from exposure to or injury by a dangerous aspect of the equipment." *Id.* at ¶ 43, 673 N.E.2d 1351. This definition was later adopted by the Ohio Supreme Court in *Hewitt v. L.E. Myers Co.*, 134 Ohio St.3d 199, 981 N.E.2d 795, 2012–Ohio–5317. In *Hewitt*, the Court thus rejected a broader interpretation that would include any generic safety-related items, as such a broad interpretation "ignores not only the meaning of the words used but also the General Assembly's intent to restrict liability for intentional torts." *Id.*

*McQuillen v. FeeCorp Indus. Servs.*, 5th Dist. Fairfield No. 15 CA 36, 2016-Ohio-1590, ¶ 20-21.

{¶ 60} The Ohio Supreme Court in *Hewitt* further noted that "[a]lthough 'removal' may encompass more than physically removing a guard from equipment and making it unavailable, such as bypassing or disabling the guard, an employer's failure to train or instruct an employee on a safety procedure does not constitute the deliberate removal of an equipment safety guard." *Id.*, ¶ 29. The Ohio Supreme Court held "that the 'deliberate removal' of an equipment safety guard occurs when an employer makes a deliberate decision to lift, push aside, take off, or otherwise eliminate that guard from the machine." *Id.*, ¶ 30.

{¶ 61} Based upon the above definition, we agree with the trial court that the dual palm buttons are equipment safety guards within the meaning of the statute. *See Fickle,* ¶ 42 ("Recognizing dual palm buttons * * * as equipment safety guards is consistent with the common definition of the statutory terms, because those devices shield the employee's hands or fingers from injury by keeping them out of the danger zone during the operating cycle.")

{¶ 62} We further agree with the trial court that there is no evidence that St. Mary's deliberately removed the dual palm buttons, thereby creating a rebuttable presumption that St. Mary's intended to injure Partin. While Partin asserts that the "Supreme Court [of Ohio] has likened deliberate removal to bypassing a proximity switch with a jumper wire," in reliance upon *Pixley v. Pro-Pak Industries, Inc.*, 142 Ohio St.3d 203, 2014-Ohio-5460, 28 N.E.3d 1249, we conclude that any bypassing of a switch by means of a separate wire requires a type of conscious act of removal not demonstrated by the

evidence herein. We further note that in *Pixley* a maintenance technician merely "explained that the only way to disable" the safety bumper at issue in that case was in the manner described, and that in *Pixley,* there was "no evidence that this ever occurred." *Id.,* ¶ 21.

{¶ 63} Regarding Partin's assertion that the dual palm buttons "were off, non-functional, electrically bypassed, and the sole person in charge of production knew this," we note that while White testified that he never witnessed the second set of dual palm buttons in use, he further testified that he believed the key to activate them remained in the switch, thus any operator or helper was able to select the appropriate mode of use. Sellman's testimony was clear that both sets of palm buttons were operational "because I checked them all the time." There was no evidence that operation of the press was in any way conditioned upon the use of only one set of dual palm controls or that the key was physically removed from the switch. We note that Partin testified that he was distracted and socializing when his injury occurred. We further cannot conclude that St. Mary's failure to lengthen the cord on the second set of dual palm buttons equates to the deliberate removal thereof, and this conclusion is supported by Huston's testimony that Partin could have used the second set of buttons while performing the Hobart job, albeit less efficiently, by walking five or six steps to their location. Since there was no evidence of St. Mary's deliberately or consciously removing or eliminating the dual palm buttons, we accordingly conclude that no genuine issue of material fact exists regarding Partin's claim that he was injured as a direct result of St. Mary's removal of the dual palm buttons.

{¶ 64} We further agree with the trial court that the metal mesh gates at the rear of the press were not equipment safety guards within the meaning of the statute.

Sellman testified that he designed, created and installed the gates, prior to White's ownership of the company, in order to keep employees, specifically "*pedestrians*," away from the rear of the press as they came and went from the parking lot. He acknowledged that to complete the Hobart production, the gates "needed to come off," and Huston indicated that the Hobart production could not have been completed with the gates in place. We conclude that the mesh gates were safety-related devices distinct from equipment safety guards. Since reasonable minds can only conclude that the mesh gates were not equipment safety guards within the meaning of the statute, no genuine issue of material fact remains, and further analysis of the removal of the gates is not required.

{¶ 65} Regarding Partin's common law claim, as noted by the trial court and the Supreme Court of Ohio, "R.C. 2745.01 does not eliminate the common-law cause of action for an employer intentional tort." *Stetter v. R.J. Corman Derailment Servs., L.L.C.*, 125 Ohio St.3d 280, 2010-Ohio-1029, 927 N.E.2d 1092, ¶ 28. As the Fifth District further noted:

Under the common-law standard set forth in *Fyffe v. Jeno's, Inc.*, 59 Ohio St.3d 115, 118, 570 N.E.2d 1108 (1991), an employee in an action for employer intentional tort could establish intent based on substantial certainty by demonstrating the following:

"(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality

or condition, then harm to the employee will be a substantial certainty; and

(3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task."

*Id.*

*McQuillen*, ¶ 13-14.

{¶ 66} Regarding the second prong of the *Fyffe* test, this Court noted that "[t]his second element is crucial to distinguish between intentional torts and accidents intended to be covered solely by workers' compensation laws. * * *." *McMahan v. Lewis & Michael Inc.,* 2d Dist. Montgomery No. 22253, 2008-Ohio-3487, ¶ 16. This Court noted as follows:

> Substantial certainty of harm requires much greater proof than negligence or recklessness. *Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St.3d 100, 117, 522 N.E.2d 489. The supreme court in *Fyffe* and *Van Fossen* explained the proof required as a progression beginning with negligence and culminating with the extreme proof required for substantial certainty. In this regard, the supreme court stated:

> "Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge

and appreciation of a risk-something short of substantial certainty-is not intent." *Fyffe*, 59 Ohio St.3d at paragraph two of the syllabus, citing *Van Fossen*, 36 Ohio St.3d at paragraph six of the syllabus.

In other words, simply knowing that the employee is at risk is insufficient; the employer must be virtually certain the employee will be injured. *Spates v. Richard E. Jones & Assoc.* (July 12, 1995), Montgomery App. No. 15057, citing *Van Fossen*, 36 Ohio St.3d at 116.

*McMahan*, ¶ 17-19. As noted by the Tenth District, "[p]rior accidents are probative of whether an employer knows that an injury is substantially certain to occur." *Taulbee v. Adience, Inc., BMI Div.*, 120 Ohio App. 3d 11, 20, 696 N.E.2d 625 (10th Dist. 1997).

{¶ 67} In order to withstand St. Mary's motion for summary judgment on Partin's common law intentional tort claim, Partin had to produce evidence that created a genuine issue of material fact that St. Mary's was substantially certain he would be injured, and we conclude that Partin failed to do so. As the trial court noted, there was no evidence produced of similar accidents on the Verson press. White testified that St. Mary's had been making the Hobart product for eight years, and Partin testified that he himself operated the press in the helper position for more than 4,000 cycles without incident. We accordingly have no basis to conclude that St. Mary's was substantially certain that Partin would injure his right thumb in the Verson press. In the absence of the extreme proof required to establish substantial certainty of injury, we conclude that reasonable minds can only conclude that St. Mary's is entitled to judgment as a matter of law on Partin's common law intentional tort claim.

{¶ 68} Having considered all of the evidence in a light most favorable to Partin,

and in the absence of a genuine issue of material fact, Partin's assigned error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . .

FROELICH, J. and WELBAUM, J., concur.

Copies mailed to:

William P. Allen
James D. Utrecht
Hon. Jeannine N. Pratt